### Case No. 1,215.

BEDELL v. The POTOMAC.

[2 Int. Rev. Rec. (1865,) 62.]

District Court, S. D. New York.[1]

COLLISION — STEAM AND SAIL — RIGHT OF WAY— DUTY OF SAILING VESSEL TO CARRY LIGHTS.

[1. There is no definite rule of law requiring sailing vessels navigating the high seas at night to carry signal lights. The Delaware v. The Osprey, Case No. 3,763, followed.]

[See rule viii., Act April 29, 1864; Rev. St. § 4233.]

[2. It is the duty of a steamer to keep out of the way of a sailing vessel approaching from an opposite direction, and the failure of the latter to carry lights at night does not excuse the steamer from such duty if the steamer, nevertheless, sees the sailing vessel in time to avoid a collision.]

[See note at end of case.]

[In admiralty. Libel by Mott Bedell, owner of the schooner A. V. Bedell, against the steamer Potomac, for collision. Decree for libelant.

[This was subsequently reversed by an unreported decree of the circuit court, and the decree of the circuit court affirmed by the

[1] [Reversed by circuit court, (not reported.) Decree of the circuit court affirmed by supreme court in The Potomac, 8 Wall. (75 U. S.) 590.]

supreme court in The Potomac, 8 Wall. (75 U. S.) 590.]

Benedict, Burr & Benedict, for libelant. Man & Parsons, for claimants.

Before BETTS, District Judge.

This was a case of collision. The libel was filed by the owners of schooner A. V. Bedell, which was sunk by the steamer in the Chesapeake bay, near the mouth of the Rappahannock river, about midnight on the 7th of July, 1859. The schooner was bound from New York to Alexandria. The steamer was bound from Baltimore to Norfolk, and heading due south. The schooner was running nearly north, close hauled. The weather was calm; stars were visible in the sky, and each of the vessels could see the other when a half or a quarter of a mile apart, so as to distinguish the character of the objects and the direction of their apparent courses. The vessels had neared each other to within a few yards, when it was discovered that they were coming in contact, and each called out to the other to get out of the way. Each vessel attempted to change its course, but, after a few minutes' fright and hopeless outcry on board of both, they came together about end to end, and the schooner was instantly sunk. The claimants insisted that the schooner was in fault in carrying no light, and a good deal of testimony was taken on both sides as to the various manoeuvres of the two vessels, each claiming that the other was not skilfully navigated.

HELD BY THE COURT: That it is needless to attempt to ascertain and adjust the reliable evidence gatherable out of the hurried and indefinite observations and impressions of the witnesses as to which vessel was most skilfully navigated; because, in the opinion of the court, that whole matter was definitely determined as a principle of law as soon as the schooner was discerned from on board the steamer. The testimony had no further agency to fulfil in the case in respect to the rights and responsibilities of the parties, after it had clearly designated that a steam and sailing vessel were exposed to a mutual meeting in the night, approaching head and head in close collateral lines, if not actually on a coincident one.

That, as Judge Grier remarks, 2 Wall. Sr. 273, [The Delaware v. The Osprey, Case No. 3,763,]—no reliable evidence exists in the books that the law requires sailing vessels navigating the high seas at night to carry signal lights,—9 N. Y. Leg. Obs. 232, 1 Spr. 160, [Jones v. The Hanover, Case No. 7,466; Lenox v. Winisimmet Co., Id. 8,248,] Pars. Mar. Law 192, note 3.

That in this condition of the law it cannot be pronounced that the schooner in this instance was guilty of an illegal act, or dereliction of maritime duty in not displaying lights conspicuously at the time. Besides, the evidence is equivocal as to the fact.

That a gross irregularity, and not being clearly explained, constituting a marked fault, was committed by the steamer in continuing to come upon the schooner without stopping, or even easing her engine for a distance of half or quarter of a mile, and during that period it is not proved that any efficient act was done by the steamer for their common protection and safety.

That the actual offence and dangerous fault of the steamer was the disobedience of the plain and peremptory mandates of the law, emphatically declared to managers of steamers who are meeting with sailing vessels, that "the steamer shall keep out of the way of the sailing ship." The corpus delicti of the Potomac on this occasion was a disobedience of that plain rule. She had ample time and clearing ability to fulfil it by stopping her movement until the danger would cease or be safely avoided; and because the steamer did not faithfully execute that duty directly charged upon her, the interdicted offence has been perpetrated, and she must pay the penalty pronounced by the law, with out regard to the mistakes or ignorance under which her officers or crew may have acted.

Decree for libelant.

[NOTE. This decision was reversed on appeal by an unreported decree of the circuit court, and the decree of the circuit court was affirmed by the supreme court in The Potomac, 8 Wall. (75 U. S.) 590. Mr. Justice Davis, in delivering the opinion, said: "The law casting the greater responsibility on the steamer on account of her motive power, and the sailing vessel having an easy duty to perform, it has been generally found, on investigation, that the collision was the result of a relaxation of viligance on the part of the officers of the steamer. It has sometimes happened, however, that the steamer was not to blame, and the present case, in our opinion, is one of that character. It is unnecessary to restate the rules of navigation, obligatory upon vessels in the predicament these were on the night in question. * * * One of these rules requires the steamer to keep out of the way of the sailing vessel; but, to enable her to do this effectively, the law imposes the corresponding obligation on the sailing vessel to keep her course. * * * The accident could have happened in no other way than by a change of the schooner's course, and that this was made is evident, for, when the vessels collided, the schooner had fallen off from about a north course to nearly an east course. Besides, the only man on board the schooner who was examined as a witness says that he put his helm hard up, by the captain's order, about two minutes before the collision. If the schooner had kept her course, instead of porting her helm, and changing it to the eastward, the collision would not have occurred."]